PRICE & NISBET *vs.* BIGHAM's EX'rs.—June, 1826.

Real estate was, after marriage, conveyed in trust for the separate use of the wife, with power to her, among other things, to sell and convey, and absolutely dispose of the same by deed, her coverture notwithstanding—*Held,* that it was competent for her, during the coverture, to charge such estate with the payment of her debts, and that equity would enforce such a contract by decreeing a sale of the estate.

That the general power granted her of disposing absolutely of the estate, included the power to incumber it by mortgage, or to charge it by contract.

Where the recital of a contract, charging an estate, was, that it was intended to secure *one debt,* and the body of the contract provided for the payment of *another debt* as well as the one recited, and there was no proof of mistake or fraud—*Held,* that the contract was to be considered as including both.

APPEAL from a decree of the Court of Chancery. The bill filed by the appellees' testator against the appellants, on the 4th of June 1816, stated that he was employed by *Frederick Price,* and *Penelope D. Price* his wife, (one of the defendants,) sometime in the year 1811, to perform certain carpenter's work in and upon a dwelling-house which the said *Frederick* was then erecting upon a tract of land, which he then held in right of his wife *Penelope,* and to which she was entitled in fee simple. That he did undertake and perform work and labour as a carpenter and joiner on said house, during which time *Penelope* directed him in the style and fashion of putting up and erecting said work. That the amount claimed by him for the said work, then unfinished, and labour, was $488 41, as contained in the account thereof exhibited. That *Frederick Price* obtained the benefit of the insolvent laws of this state, and was discharged from all claims of his creditors; and that the complainant then refused to proceed with his said work until he should be paid or secured for the work he had done. That the said *Penelope* requested him to proceed with and finish the work so commenced by him, and agreed, that if he would proceed with and finish the same, he should be paid for the work he had heretofore done, and also for the completion of the carpenter's work on the said house and buildings; and that to secure him for the said work which he had performed, and was to perform, the said *Penelope* offered to subject her said tract of land to the payment of the amount of the said

work so done as aforesaid, and for work to be performed, and all materials furnished. That the said tract of land was conveyed by *William McMechen* to *Alexander Nisbet*, (the other defendant,) in trust for the sole use and benefit of the said *Penelope*, by deed dated the 12th of January 1810. That accordingly *Penelope* did, by her certain agreement, dated the 14th of October 1813, contract with the complainant to pay him for the work to be performed on the said house, and also to pay him for the work then unfinished, and for all materials which he might furnish in and about the premises; which said agreement was signed, sealed and delivered by her, and also signed by *Nisbet* the said trustee; and in and by which said agreement the said *Nisbet* is authorised to hold the said land charged with the payments for the said work, and to sell such part thereof as would satisfy the payment of all materials which the complainant might furnish at the instance of *Penelope*, and the payment of all unfinished work then about the said buildings, and for all work which he might thereafter do about the same, as by the agreement exhibited would appear. That the complainant, soon after commenced his work on the said buildings, and completed the same, and had the work measured and valued, and which amounts to the sum of $1949 53, as appears by an account thereof exhibited. That he found and furnished materials for the buildings to a considerable amount, &c. viz. $150, and that he had been put to considerable expense and trouble in and about the premises. That he had frequently applied to said *Penelope* and *Nisbet* for payment of the said sums of money, which they have uniformly neglected to pay or to give him any satisfaction therefor; and he had frequently applied to the said *Nisbet* to make sale of the lands so conveyed to him in trust, and in pursuance of the said agreement to pay to him the complainant the respective sums of money before mentioned, and all the interest thereon due; but that *Nisbet* refused to sell the said lands and pay the complainant, and had neglected and omitted to execute the said trust reposed in him. That the said *Frederick Price* is since deceased. Prayer, that *Penelope* may be decreed to pay to the complainant the said respective sums of money, and the interest thereon, so due to him, together with the costs of this suit, by a certain day to

be appointed; and in default thereof that the land, mentioned in the said agreement and deed therein referred to, may be sold, and the proceeds thereof applied to the discharge of the complainant's said claim, interest and costs; and for other and further relief, &c.

*Exhibit* by the complainant, (besides his accounts, &c.)— A deed of trust executed by *William M'Mechen*, *Frederick Price*, and *Penelope D.* his wife, to *Alexander Nisbet*, dated the 11th of January 1811, reciting, that on the 12th of January 1810 the said *Frederick Price*, and *Penelope D.* his wife, had conveyed to the said *M'Mechen*, (which said deed the complainant also exhibited,) all the lands and estate which the said *Penelope* was or could be entitled to in virtue of the last will of *Thomas Cockey Deye*, and which by a division of a part of the real estate of the said *Deye*, made by order of the court of chancery, amongst certain of his devisees, was allotted to the said *Penelope* as lot number one—To hold the same unto the said *M'Mechen*, his heirs and assigns forever—In trust for the uses, intents and purposes therein expressed and set forth. That the said *Frederick Price*, and *Penelope D.* his wife, desirous to alter and change the said trust estate in relation to the said lot number one, &c. the above mentioned deed was executed, conveying the said lot number one to the said *Nisbet*, his heirs and assigns—"In trust, that the said *Alexander Nisbet*, and his heirs, shall henceforth be and stand seized of the said lot of land number one and premises, with the appurtenances, to and for the sole and separate use and benefit of the said *Penelope Deye Price*, so that she be permitted to use, occupy, and enjoy the same, and the rents and profits thereof to have, receive, take, and apply to her own sole and separate use and benefit, her coverture notwithstanding, for and during the term of her natural life, or until the same land and premises shall or may be disposed of by her in the manner hereinafter limited and expressed. And also upon this further trust, that the said *Penelope Deye Price* shall be suffered and permitted to sell and convey, and absolutely dispose of, by deed or deeds duly executed by her, the same lot of land and premises, or any parts, part or parcel thereof, to such person or persons, and for such sum or sums of money, or other consideration, as she at any time or

times shall or may think proper, her coverture notwithstanding; so that the said hereby granted and released land and premises shall not, nor shall any part or parcel thereof, be subject at any time to the disposition or management of the said *Frederick Price,* or any future husband of the said *Penelope.*" Provision is then made as to such portion of the said land and premises as may remain undisposed of, &c.

The complainant also exhibited the following agreement, referred to in his bill, and which was afterwards proved under the commission which issued to take testimony: "*Baltimore* county, to wit. Whereas *Frederick Price,* husband of *Penelope Price,* is now building a house on a tract of land conveyed by *William M'Mechen, Frederick Price,* and *Penelope,* his wife, to *Alexander Nisbet,* in trust for the purposes therein mentioned, by indenture recorded in," &c. "And whereas *Robert Bigham* has undertook to complete the unfinished work now about said house. And whereas the said tract of land has been conveyed to the said *Alexander Nisbet,* in trust for her separate use, and she is desirous of securing to the said *Robert Bigham* the payment of the sum which the completing of the said unfinished work may amount to. Now therefore, these are to authorise the said *Alexander Nisbet* to hold the said tract of land charged with the payment of the amount of the said *Robert Bigham's* bill of work as before mentioned. And in case the said *Penelope Price* shall not pay, or cause to be paid, to the said *Robert Bigham,* the amount of his bill, which shall be ascertained by persons indifferently chosen by Mrs. *Price* and *Robert Bigham,* and if they differ in opinion, they are to choose a third; and the determination of any two to be binding on the parties, and the amount paid to the said *Bigham* by the first day of December 1814, which she hereby promises to do. Then the said *Alexander Nisbet* is hereby authorised to hold the said tract of land, charged with the payment of said sum; and the said *Nisbet* is hereby authorised to make sale of so much of said land as will satisfy the payment of all materials which said *Bigham* may furnish at the instance of Mrs. *Price,* and the payment of all unfinished work now about said building, and for all work which he may hereafter do about said building, and ascertained as aforesaid. In witness whereof, the

said *Penelope Price* hath hereunto set her hand, and affixed her seal, the fourteenth day of October 1813.

*Penelope D. Price.* (L. S.)

Signed, sealed and delivered, in the presence of *Francis T. D. Owings.*

I have received notice of the within engagement made by *Penelope Price.*                              *Alex. Nisbet.*

The house to be completed and finished by the 15th of March 1814.    Witness my hand and seal the said 14th October 1813.

*Robt. Bigham,* (L. S.)

Witness, *Francis T. D. Owings.*"

The answer of *Nisbet* is not considered to be material. That of Mr. *Price* admits that the complainant was employed by her husband in his lifetime to perform certain carpenter's work upon a dwelling-house, which her husband was then building, as stated in the bill of complaint; but she does expressly deny that she either did or could make any contract with the complainant, as stated in his said bill, she being then a married woman.    She admits that the complainant did perform certain parts of the carpenter's work on said house during the life of her husband; but that a considerable part thereof then remained to be done and performed.    And as her husband died insolvent, the complainant requested her to become responsible for the work which had been done on said house, and to be employed to complete the same; but she positively refused to engage or agree to pay for the work which the complainant had done, and had begun to contract with another carpenter to finish the same, who proposed to do the same in a plain manner, as she desired, for the sum of $700.    That when the complainant understood she was about to employ another carpenter, he applied to her, and requested, that as he had lost the work already done on said house, he ought to be preferred in being employed to complete the carpenter's and joiner's work thereof, as he would do it as reasonable as any other person.    That in consideration of this representation, she did agree that the complainant should finish the said work, and that she would pay him therefor, and also for any materials he might furnish for the same; and for this purpose, and with this view only, she entered into a contract with the complainant.    But she expressly denies that

she ever intended or agreed to pay the complainant for any work, either finished or unfinished, which had been done in the lifetime of her husband; and she so expressly understood the aforesaid contract at the time of executing it. And if there are any words therein which may imply any other engagement, they were artfully and covertly brought in to delude and deceive her, and were not observed or so understood by her at the time. That the complainant in finishing the said work did maliciously and fraudulently, against her repeated requests and his own agreement, execute work in the most expensive manner, and instead of completing the same by the 15th of March 1815, which he was bound and ought to have done, he neglected to finish the same until nearly about a year after that time, and even then he left it unfinished, to her great detriment and injury; and instead of executing the work in a neat, economical and plain manner, he did it in such a manner as greatly and unnecessarily to enhance the costs thereof, against her consent and wishes, and his repeated promises. That she has always been desirous and willing to pay the complainant whatever he was justly entitled to for finishing said work, and for the materials furnished by him; but he always demanded to be paid for work done in the lifetime of her husband, and under the contract; and has also demanded a much larger sum than he was entitled to for finishing said work. That she is willing to pay him whatever he may be justly and legally entitled to demand under the said contract, which she alleges he has violated in several respects, but particularly in the time and manner of finishing said work. All which matters and things are, as she is advised, properly and exclusively in the cognizance of a court of common law, and a jury. She therefore prays to have all the advantage thereof in the same manner as if the want of jurisdiction of this court had been presented in the form of a plea or demurrer, &c.

A commission issued, and testimony was taken under it, and the cause argued and submitted, &c.

JOHNSON, Chancellor, (December Term 1823.) On the 11th of January, 1811, *William M'Mechen*, who then held certain real property in virtue of a deed from *Penelope D. Price,* and

*Frederick Price* her husband, to him in trust for them, joined with them in a deed, by which the same property was conveyed to *Alexander Nisbet* in fee, in trust "that the said *Alexander Nisbet*, and his heirs, shall henceforth be and stand seized to and for the *sole* and *separate* use and benefit of the said *Penelope Deye Price*, so that she be permitted to use, occupy, and enjoy the same, and the rents and profits thereof to have, receive and take, and to apply to her own sole and separate use and benefit, her coverture notwithstanding, for and during the term of her natural life," &c. And on this further trust, "that the said *Penelope Deye Price* shall be suffered and permitted to *sell, convey, and absolutely dispose of,* by deed or deeds duly executed by her," the property, or such part as she pleased, her coverture notwithstanding.

It is alleged in the bill, and proved by the evidence in the cause, that *Frederick Price*, the husband, engaged the complainant, a carpenter, to build a dwelling-house on the property, and to find materials for that purpose; that before the same was finished, it being doubtful whether the husband would be able to pay for the building and materials, the complainant was unwilling to proceed unless the wife, who had the beneficial interest in the land on which the house was erected, would become responsible. Accordingly, on the 14th of October 1813, an agreement in writing was executed by her, under her hand and seal, of which *Alexander Nisbet*, the trustee, was apprised, as appears by his admission on the agreement itself. The agreement in substance is as followeth: Whereas *Frederick Price*, husband of *Penelope Price*, is now building a house on the land conveyed by *M'Mechen* to *Nisbet*, in trust for the purposes mentioned. And whereas *Robert Bigham* has undertook to *complete the unfinished* work now about said house, and *Penelope Price*, being desirous of securing to the said *Robert Bigham* the payment of the sum *which the completing of the said unfinished work may amount to,* therefore the agreement proceeds to "authorise *Nisbet* to hold the tract of land charged with the payment of the amount of the said *Robert Bigham's bill of work, as before mentioned.* And in case the said *Penelope Price* shall not pay, or cause to be paid, to the said *Robert Bigham* the amount of his bill, which shall

be ascertained by persons indifferently chosen by Mrs. *Price.* and *Robert Bigham,*" by the first of December 1814, then *Nisbet* is authorised to make sale of so much of said land "as will satisfy the payment of all materials which said *Bigham may* furnish at the instance of Mrs. *Price,* and the payment of all unfinished work now about said building, *and for all work* which he *may hereafter* do about said building, and ascertained as aforesaid."

After the attention of the court had been called to this cause, and on the 8th of November 1822, an interlocutory decree was passed, in which it is observed, that "it appears by the order of my predecessor that this cause was argued before him at September term 1821, when no authorities in support of, or in opposition to the claim, were produced, in consequence whereof he directed a new argument; and in the order he observed, that a reference to the authorities as to the agreement having been executed by a *feme covert,* is desirable. None appears to have been submitted to him, nor have any such authorities been laid before me. Nor am I at this time prepared to determine on the merits of the case, either in respect to the obligation of the alleged contract, or its extent. But that as little delay may take place as possible, and as full an opportunity be given to the counsel to furnish authorities as the importance of the principle involved in the case demands, it is thought proper to pass an interlocutory decree, by which the sum the complainant may be entitled to recover, (if he can recover any sum,) will be made to appear. Without the aid of a recent examination of the authorities, and with the view of directing the attention of the solicitors to the point on which my opinion is suspended, I would remark, that it is clear that when previous to marriage, a marriage contract is entered into, vesting in trustees property for the sole use of the wife, subject to her disposal and her engagements, there a court of equity would compel a compliance with the terms of her contracts; and where she had been authorised to sell and dispose of the property held in trust for her separate use, there, I presume, it would be equally in her power to encumber the estate with her engagements, on the principle that the greater power comprehends the less. But are there any cases determined in which, after the marriage,

the ordinary legal capacity of the wife can be enlarged so as to make her or her property responsible for her contracts? The case of the complainant is hard indeed; for if he has no remedy in this court, it is most clear to my mind, none can be obtained at law." The interlocutory decree then directs four accounts to be made—*First,* to allow to the complainant a just compensation for the *whole of the work and materials. Secondly,* only to allow to him for the materials and work after the 14th of October 1813; and if there is any contrariety in the evidence in regard to the value of the work, the two accounts above directed are to be stated according to the average value of the work and materials; and two other accounts, having the same regard to the contract of the 14th of October 1813 from the evidence of the appraisers solely.

On examining the evidence, the auditor discovered that there was no contrariety, and therefore, under the interlocutory decree, he reported two accounts, the one, No. 1, allows to the complainant for the whole of the work and materials. No. 2 rejects for the work and materials since the 14th of October 1813. The report is dated the 27th of January 1823. The sum due, if the complainant is entitled to the whole amount, is, including interest to the 1st of July 1823, $4164 63. If entitled to recover only for the work done, and materials found, subsequent to the contract, including interest as above, the amount is $3,454. Exceptions have been taken to the auditor's accounts on the part of the complainant.

Notwithstanding the request of my predecessor, and myself, as disclosed in the interlocutory decree, no authorities have been furnished or referred to by the solicitors on either side, and the cause remains to be decided, unaided by the assistance the researches of the counsel could have cast on the subject.

Two questions appear to me to arise in the cause. The first is the agreement, executed by a *feme covert* in the predicament in which Mrs. *Price* stood, binding and to be enforced in this court? Second. If obligatory, doth it extend to the whole work, and to all the materials? Cases of this description seldom arise in this state; indeed this is the first of the kind to which my particular attention has been drawn. But after the examination of the *English* authorities, where similar questions

frequently arise, the doubts entertained previous to the inter-locutory decree are entirely removed, and I have no hesitation in saying, situated as Mrs. *Price* was when she entered into the agreement, she was competent to bind herself so as to *af-fect the property* held in trust for her.

In *England*, previous to the case of *Ringstead vs. Lanes-borough*, which was determined in the reign of *George* III, *(Co. Bankrupt Laws*, 32,) the law appears to have been clearly established, that it was incompetent for a *feme covert* to enter into any contract that would be binding at law; be-cause she had no power to assent so as to bind herself; for in *consideration of law* she had no will of her own; for by the marriage contract her will was subject to that of her husband, of course she had no power to bind her husband, and it would be useless to bind herself, as she could have no property. By the marriage her personal property vested in her husband, and during their lives he had the control over the real. 1 *Pow. on Cont.* 93. But in the case of *Ringstead vs. Lanesborough*, it was determined that the contract of a *feme covert*, who had parted from her husband, by mutual consent, with a separate maintenance created by deed at the time of the separation, could be enforced even at law. But Lord *Mansfield*, in deli-vering the judgment of the court, declared "that his opinion was founded on all the circumstances of the case taken together, and would only be an authority in a case circumstanced ex-actly similar to the present." In the case mentioned, the cir-cumstance of the husband's being a resident abroad was relied on. But in the case of *Bartvell vs. Brooks*, determined the year following, (*Co. Bankrupt Laws*, 36,) a broader ground is taken, to wit, that the *feme covert* is bound by her con-tracts *if the husband himself is not liable for her debts.* The case was this—An action was brought for goods sold and delivered to a *feme covert*, who pleaded the coverture; to which it was replied, that she lived separate and apart from her husband; that she had a separate maintenance regularly paid, and that the goods furnished were for her separate use and support. To the replication she demurred, which was over-ruled. In pronouncing the opinion, the court observed that the principle of the judgment in the case of *Ringstead vs.*

*Lanesborough* was, *that the husband was not liable.* The court of law having sustained these suits, in the next case of *Corbett vs. Poilnitz,* (1 *T. R.* 5,) moved a step farther, and if the principles which governed the last decision are to prevail, all contracts of *femes covert,* having a separate provision, and living apart from their husbands by mutual consent, may be enforced in a court of law, as if made by a *feme sole.* But the last determination appears not to meet with the approbation of subsequent courts, and the principles on which the judgment was predicated are most unanswerably proved by Mr. *Powell* to be incorrect. See 1 *Pow. on Cont.* 81 to 97 inclusive. In the three cases mentioned the deeds or instruments, by which the maintenance was created, were made after the marriage, and not in virtue of a previous marriage contract. Nor does there appear to be any fault found with the decisions, except that they were made by courts of law, whose judgment must be enforced, when pronounced against a *feme covert,* as if she was a *feme sole;* that is, her person and all her property be made subject to their operations, not confining them to the fund over which she had the sole control, as would have been the case on an application to a court of equity for redress. The power of the court of chancery to enforce the contracts of *femes covert* having property held in trust for them, over which they have the control, has never been questioned, except when the contract, or intended disposition of the property held in trust exceeds her power, as created and limited by the trust deed. I am perfectly satisfied in this case, that the power of Mrs. *Price* over the property was full and ample, and that she was competent to enter into the contract in question with the complainant; that she, her coverture notwithstanding, is bound by it, so far as to affect the trust fund. The extent of the agreement remains to be considered.

In this part of the case I am not so clear, but shall give to the contract that construction which is just, and of which it appears susceptible. Plausible reasons may be given limiting its operation to the work done, and to the materials found, subsequent to the date of the contract. To judge by the *recitals* of the instrument of writing itself, it would seem that she contemplated only to pay for future work and materials; for it

*recites* that "she is desirous of securing to the said *Robert Big-ham* the payment of the sum which the completing of the said unfinished work *may amount to.*" If the body of the instrument had pursued the language of the *recital*, I should have confined the contract to the future work, and future mate-rials; but the language appears more extensive, and capable to comprehend the whole.

From the evidence in the cause, the work appears to have been faithfully done, and it is but just and equitable that the workman should receive compensation for the whole, and not for part only. If, therefore, the contract can embrace the whole, that construction should be given to it. If evidence *de hors* the instrument can have any influence, it is proved that the whole was to be covered by the contract; for *Edmund T. Scarff,* her manager on the farm, proves that she told him, *Bigham* would not go on with the work unless she would pay for the whole, and that she was, to use her language, *forced to agree.* What motive could induce a carpenter to go on and finish a building, if he was only to be compensated for his fu-ture labour and materials? But when the person, with whom the engagement is made, has, or is to have, the use and benefit of the whole building, it may fairly be inferred no reasonable objection would be made against paying for the whole; and if therefore the language of the instrument is sufficiently compre-hensive, it ought to embrace the whole.

The agreement authorises the trustee to hold the property "charged with the payment of the amount of the said *Robert Bigham's* bill of work, as before mentioned;" and in case she should not pay "the amount of the bill, which shall be ascer-tained by persons indifferently chosen," by the first day of De-cember 1814, "which she hereby promises to do," then the trustee is authorised to sell, &c. Unless the words in this sec-tion first taken from the agreement "before mentioned," limits *Bigham's* bill of work to future work, they are comprehensive enough to embrace the whole claim. But the latter part of the agreement appears more clearly to authorise a compensation for the whole. For the trustee is authorised to sell "so much of said land as will satisfy the payment of *all* materials which said *Bigham may* furnish at the instance of Mrs. *Price, and*

the payment of *all unfinished work* now about said building, *and* for all work which he may *hereafter* do about said building."

The only doubt, of which the part of the agreement last quoted is susceptible, is, whether she was to pay for the materials before furnished; for it expressly provides for those which *may* be furnished; and expressly provides for the payment of *"all unfinished* work *now* about said building," as well for that which *"*he may hereafter do;" that is, both unfinished work then done, as well as for all future work, are to be paid for. In my opinion the agreement comprehends all the work and materials. But if the agreement did not extend to the anterior work and materials, yet, as she had the whole benefit of them, and as they were placed on her separate property evidently with her consent, and have not been paid for, even on this ground the complainant would seem entitled to relief.

The exceptions of the complainant, so far as they extend to the account No. 2, omitting to charge the defendants with the $488 41, are ruled good; but so far as they relate to the manner of charging the interest in the account No. 1, are overruled, and that account is confirmed—*Decreed,* that unless the defendants shall, on or before, &c. pay to the complainant, or bring into this court to be paid to him, the sum of $4164 63, with interest on $2862 29, a part thereof, from the 1st day of July 1823, until paid, together with the costs of this suit, the property in the proceedings mentioned shall be sold, &c. From this decree the defendants appealed to this court, where the death of *Bigham* was suggested, and his executors appeared, and were made parties.

The cause was argued at June term last before BUCHANAN, Ch. J. and EARLE, STEPHEN, and ARCHER, J.

*Mayer,* for the Appellants. 1. It is attempted, in this case, to charge certain real estate with the appellees' claim, in consequence of the supposed interest in Mrs. *Price* in it, or of her disposing power over it. The property attempted to be thus affected, is described in a deed of trust of Mrs. *Price* to *Alexander Nisbet,* and there the appellees contend such interests and powers are secured to Mrs. *Price,* as under the contract of

that lady with their testator, subject the land to his claim. We shall endeavour, in the first place, to show what interest was given by this deed to Mrs. *Price,* and what was the nature of the power in regard to the land which it conferred upon her. The deed conveys the land, (Lot No. 1,) to *Nisbet,* in trust, "to and for the sole and separate use and benefit of *Penelope D. Price,* so that she be permitted *to use and enjoy the same, and the rents and profits thereof,*" for her life, or until disposed of as thereinafter limited, and upon the "further trust that she shall be suffered and permitted *to sell and convey,* and *absolutely dispose of,* by deed or deeds, *duly executed* by her," the said lot, or any part of it, "for such sum or sums of money, or other consideration," as she may at any time think proper, "her coverture notwithstanding." The deed proceeds then to give her a power of appointment by will, and then limits the estate, in default of appointment, in further trust, "for the right heirs of the said Mrs. *Price,* and their assigns, as tenants in common, *in fee,*" and that the trustee shall "convey the same accordingly." This conveyance vests in Mrs. *Price* only a life-estate in the land—and secures the remainder in fee upon it to such persons as shall prove to be her "right heirs"— and the power of sale, &c. imparts to her no additional interest. Although it may be true, (notwithstanding our act of assembly abolishing livery of seisin, of 1715, *ch.* 47,) that the deed here, since it contains words of bargain and sale, as well as of feoffment, operates as a deed of bargain and sale would in *England,* and conveys to Mrs. *Price* only a trust estate; yet it is observable, that the deed secures to her the *immediate* enjoyment of the land, and its profits, for her life, without the control of the trustee either over the land or its product. It secures her, therefore, *effectively,* an estate *such* as she would have had under a deed of feoffment to *Nisbet,* for her use, for life; and though therefore, the statute has not in fact executed the use in her, the peculiar phraseology of the deed requires an interpretation of her interest, *as if* the use were executed. This too, is the more evidently the right construction, when we find that she has, by the terms of the deed, no power secured to her of disposing of her life-estate, independently of her husband's concurrence, and differently from that mode of alienation, which

by our acts of assembly is enjoined for a *feme covert's* interest in land.   In *England* it is usual, as will appear in almost all the cases there which relate to the questions now involved, the beneficial interest is to be enjoyed by *the wife* derivatively from the trustee; as, for example, where she is to receive the rents, the trustee is to have th. m in trust, to pay them over to the *feme covert.*   This gives the trustee a control over the substance and usufruct of the estate, and makes him, in some cases, as the depository of the *beneficium* of the trust, amenable to a court of chancery, and virtual surety to the extent of his trust-avails for the wife.

2.  The estate given to Mrs  *Price* by the deed of trust to Mr. *Nisbet,* is only for life.   The ultimate limitation to her heirs, refers to them as heirs, only *descriptione personarum.* It eventually gives the land, in default of her appointment, to her right heirs "*in fee,*" and as "*tenants in common.*"  The superadded words "*in fee,*" of themselves, denote the "right heirs" to be purchasers, as it makes them the *propositi* and the beginning of an estate "*in fee;*" and then the qualifying their estate as a tenancy in common, contrary to what it would have been if by descent, confirms the idea that they take by purchase and not by limitation.   It is to be remarked too, that the estate is to be conveyed to the heirs by the trustee, for the *expressed purpose* of putting an end to the trust, and giving them the legal estate.   The estate, therefore, secured to them is a legal estate, while Mrs. *Price's* precedent life-estate is equitable.   These two estates cannot coalesce to make up the fee in her, and hence Mrs. *Price* can take only a life-estate, and the rule in *Shelly's* case cannot serve here  to enlarge her  interest into a fee.   It is, besides, to be observed, that a court of equity does *not,* in reference to equitable estates and trust settlements, hold itself bound by the rule in *Shelly's* case, with the same invariable strictness that it is applied, by courts of common law, to legal estates.   Chancery never does enlarge the precedent life-estate into an estate in fee simple, or fee tail, in consequence of a subsequent limitation, unless by not doing so they violate the manifest intention of the grantor.   It cannot be pretended, that any such intention is indicated here—but, on the contrary, the words, and the whole scope of the trust, show

that Mrs. *Price* was meant to have only a life-estate.    *No pow-*
*er being reserved to Mrs. Price of disposing of her life es-*
*tate,* she could not charge it, as pretended by the appellees,
and could convey it only *in conjunction with her husband.*
There is nothing, therefore, to which the appellees' demand
can apply.

3. The power of selling the fee, reserved to Mrs. *Price,*
does not vest in her the fee simple interest.    Conferring on her
no right to the proceeds of sale, and not showing how they
shall be appropriated, she stands invested with a mere autho-
rity, uncoupled with any interest, except *perhaps* as at com-
mon law, and subject to all her husband's rights.    He might
have disposed of the proceeds, and could only have been pre-
vented by the interference of chancery, as in ordinary cases of
the product of a wife's interest in realty.    Without the most
explicit provisions to that effect, a wife obtains no *separate es-*
*tate* in land under a settlement.    The authorities show, that
the terms must be so unequivocal and exclusive, as to leave *no*
*question* that the estate is. to be *separately* and *exclusively*
her's.

4. The settlement does not authorise Mrs. *Price* to sell the
land as if she were a *feme sole,* but empowers her to do so
only by deed duly executed.    It must be executed by her *and*
*her husband,* according to our act of assembly, which compre-
hends all conveyances in which a *feme covert* is *"named as a*
*grantor."*    The proper construction of the power of sale is,
according to *Chudleigh's* case, that the trustee here has the
entire legal and beneficial interest, and the purchaser obtains it
by way of a springing use.    The power here excludes the hus-
band's marital *interest,* not the marital care and guardianship
in reference to her conveyances, on account of which superin-
tendance the law requires him to unite in them.

5. There was no contract "to sell" here, as pointed to by the
power; and no attempt to execute the power; and without
such an attempt a court of equity never interposes to carry a
power into specific performance.    The contract between Mrs.
*Price* and *Bigham* is not to be effectuated as an informal exe-
cution of her power, under the settlement, of "selling and dis-
posing."

6. The contract even of one *sui juris*, like that between Mrs. *Price* and *Bigham*, would not bind *specific* property, as it is pretended shall be done here.

7. It is only personalty, secured to a wife's separate use, that has ever been esteemed, without an express *special power* of disposing and charging it, subject to the wife's power in those respects *as if she were a feme sole*—and rents and profits, regarded as personalty, and *when under the trustee's control*. Real estate, *though settled to her separate use*, is not, from that circumstance alone, liable to be disposed of, and charged by her as if she were unmarried. She must be expressly authorised to that effect, or the trustee must have control over the rents and profits. There is no valid charge therefore here.

8. A decree, especially under the circumstance of this case, against a wife's separate estate, must be executed through coercion of the trustee, under his power over the usufruct of the land. No decree, as was done in this instance, can be rendered against the wife, or *for the sale of the land.*

9. The contract between Mrs. *Price* and *Bigham* should, if regarded at all, be considered, according to the original understanding, as embracing the work to be done, and not that already executed. The recitals of the contract show that this was the intent; and the provision for the old work is foisted into the agreement fraudulently, as *Nisbet* proves, and as *Bigham* himself meant, when he said there was a *"take-in"* in it. Parol evidence on this head, in withstanding specific performance, is admissible to prove fraud or mistake.

10. There is no proof as to the extent of work done before, and that done after the contract. Part of the account is a demand of *Bigham* and *Barber*, and not *Bigham* alone. The work was extravagantly done. *Bigham* admitted he had lost his demand for the old work. Neither the value of the old, nor of the new work, appears to have been ascertained *according to the mode prescribed by the contract.*

11. A contract, to be specifically performed by chancery, *must be above all exception, and free from all suspicion.* This contract is not only liable to suspicion, but proved to be fraudulent, by its recitals and structure.

12. *Nisbet*, as a disinterested person, is a competent witness;

and having been cross-examined without protest, his evidence is admissible, although no previous order for examining him was obtained by Mrs. *Price.*

13. The position that Mrs. *Price's* estate is to be dealt with, on the score of liability for her engagements, as if it were a use executed, is enforced by analogy from cases of constructive trusts. The principles there, show Mr. *Nisbet,* in this case, to be a mere nominal instrument, in reference to the trust, with no control, liable to no obligation, and to no degree of equity, in reference to the land, or its rents and profits—the only mode by which *a feme covert's separate estate can be made liable for her engagements.*

14. At all events, Mr. *Nisbet,* as the guardian of the estate, and not a stranger, should be the trustee for any sale ordered under the proceeding—And all the land should not be absolutely decreed to be sold, but only the necessary part for satisfying the demand.

15. We have finally made a question, whether the deed of trust to Mr. *Nisbet* is valid, and whether it has fully, or in any respect, superseded or revoked the prior deed of trust to Mr. *M'Mechen.* It will be observed, that by that original deed of trust to *M'Mechen,* the lot No. 1, which is the only land comprised in the deed to *Nisbet,* is conveyed in trust for Mr. *Price, after Mrs. Price's death;* and after his death, as she should appoint *by will;* and to her heirs, in default of appointment. There is no express limitation of an estate for life to Mrs. *Price:* she, therefore, takes a resulting use out of her former estate for life. The conveyance to *M'Mechen* is by bargain and sale, and the limitations are therefore trust-estates, or uses on uses. With those estates, consequently, Mrs. *Price's* estate, being but an abiding use out of her primitive interest, cannot unite; and therefore the final limitation to her heirs cannot avail to give her an estate in fee, which she professes to dispose of by the deed to *Nisbet,* and which, to make that deed effectual, she must have had. To the same point we might here apply the remarks we used in reference to the right of the heirs, as mentioned in the deed to *Nisbet,* so as to take the limitations there, according to the construction of courts of equity, out of the rule in *Shelly's* case. In the case of *Pybus vs. Metford,*

where there was also an estate for life by implication, and remainder to the heirs of the tenant for life, and where the remainder was held to enlarge the estate for life, according to *Shelly's* case, the settlement was by covenant, on the part of the tenant for life, to stand seized to uses, and as well the estate for life as the remainder was served immediately out of the original use.    As to the fee, therefore, we think it indisputable that the deed to *Nisbet* did not revoke the deed to *M'Mechen;* and so far as the claim of the complainant reposes on the power of selling lot No. 1, as reserved to Mrs. *Price* in the deed to *Nisbet,* it certainly cannot prevail.    It is plain, then, that the power of selling, or any actual or constructive limitation of the fee, in the deed to *Nisbet,* is entirely invalid.    And we further contend, that that deed does not operate at all, and not even on Mrs. *Price's* life-estate as secured to her by the deed to *M'Mechen.*    The avowed purpose, and moving consideration of the deed to *Nisbet,* as recited in it, was to change the trusts of the prior deed.    In regard to Mrs. *Price,* no change of estate was made, for in both deeds she is alike provided for, and in neither has she a power of disposing even of her life-estate    The leading object of the deed, the change of the trusts, could not be gratified in consequence of the peculiar limitations of the deed to *M'Mechen;* and therefore, we insist, that the deed to *Nisbet* cannot, for any purpose, or to any extent, be operative.    For it must be remembered, that courts of equity, in construing deeds of trust, regard the declared intention of the grantors as a binding rule, and as the object for which alone the deed is to stand.    Hence, in *New York,* where the estate described would, if a legal estate, be deemed only for life, it has been declared a fee simple interest, because no other would serve the intention of the grantor, and answer his defined purpose.

On the *second point,* he cited *Fearne Cont. Rem.* 84, 86, 88, 90, and the remarks on the case of *Bagsham vs. Spencer.*

On the *third point*—3 *Leon.* 71.    *Bradley vs. Westcott,* 13 *Ves.* 445, 451.    *Thorpe vs. Goodall,* 17 *Ves.* 388, 460, 462.    *Townsend vs. Windham,* 2 *Ves.* 3.    *Darley vs. Darley,* 3 *A k.* 399.    *Lee vs. Prieaux,* 3 *Bro. Chan. Rep.* 382.    *Lumb. vs. Milnes,* 5 *Ves.* 517.    *Hartley vs. Hurle, Ibid* 540.    *Bran-*

*don vs. Robinson,* 18 *Ves.* 434. *Rich vs. Cockell,* 9 *Ves.* 370, 377. *Brown vs. Clark,* 3 *Ves.* 166. *Dakins vs. Berisford,* 1 *Chan. Cas.* 194. *Jacobs vs. Amyatt,* 1 *Madd. Rep.* 376. 1 *Madd. Chan.* 372, 380. *Birch vs. Blagrave, Amb.* 264. *Wright vs. Englefield, Ibid* 461. *Peacock vs. Monk,* 2 *Ves.* 190. *Wright vs. Cadogan,* 6 *Bro. Parl. Cas.* 156. *Rippon vs. Dawding, Amb.* 565. *Dillon vs. Grace,* 2 *Sch. & Lef.* 463. *Hulme vs. Tenant,* 1 *Bro. Chan. Rep.* 16. S. C. 2 *Dick.* 560. *Fettiplace vs. Gorges,* 1 *Ves. jr.* 46. S. C. 3 *Bro. Chan. Rep.* 8. *Pybus vs. Smith, Ibid* 340. S. C. 1 *Ves. jr.* 193. *Rich vs. Cockell,* 9 *Ves.* 369. *Wagstaff vs. Smith, Ibid* 520. *Sturgis vs. Corp,* 13 *Ves.* 190. *Whistler vs. Newman,* 4 *Ves.* 129. *Grigby vs. Cox,* 1 *Ves.* 518. *Essex vs. Atkins,* 14 *Ves.* 547. *Mores vs. Huish,* 5 *Ves.* 692. *Hulme vs. Tenant,* 1 *Bro. Chan. Rep.* 17, *(note.)* *Methodist Episcopal Church vs. Jaques,* 3 *Johns. Chan. Rep.* 113.

On the *fourth* and *fifth points*—7 *Bac. Ab.* tit. *Uses and Trusts,* 112; and *Chudleigh's* case, 1 *Coke,* 121.

On the *sixth point—Bull vs. Vardy,* 1 *Ves. jr.* 270. *Arundel vs. Phillpot,* 2 *Vern.* 69. *Hulme vs. Tenant,* 1 *Bro. Chan. Rep.* 21. *Thorpe vs. Goodall,* 17 *Ves.* 388, 460, 462. 2 *Madd. Chan.* 372, 380.

On the *seventh* and *eighth points—Duke of Bolton vs. Williams,* 2 *Ves. jr.* 138. *Jones vs. Harris,* 9 *Ves.* 486, 498, 521. *Wagstaff vs. Smith, Ibid* 521. *Hulme vs. Tenant,* 1 *Bro. Chan. Rep.* 17, *(note.)* *Dillon vs. Grace,* 2 *Sch. & Lef.* 456. *Heatley vs. Thomas,* 15 *Ves.* 596. *Standford vs. Marshall,* 2 *Atk.* 69, *Lee vs. Muggeridge,* 1 *Ves. & Beam.* 118. *Bullpin vs. Clarke,* 17 *Ves.* 365. *Bull vs. Vardy,* 1 *Ves. jr.* 270. *Arundel vs. Phillpot,* 2 *Vern.* 69. *Hulme vs. Tenant,* 1 *Bro. Chan. Rep.* 21. *Thorpe vs. Goodall,* 17 *Ves.* 388, 460, 462. 1 *Madd. Chan.* 372, 380.

On the *ninth point—*1 *Pow. on. Cont.* 404, 294, 432, 427, 428. *Ham. Dig.* 288. 2 *Eq. Ca. Ab.* 480, 482. 1 *Fonbl.* 188, 189. 2 *Fonbl.* 43, 135.

On the *eleventh point—*1 *Fonbl.* 122, (and *note.)* 1 *Pow. on Con.* 294. 2 *Eq. Ca. Ab.* 480, 482. *Montague vs. Maxwell,* 1 *P. Wms.* 620. *Brooke vs. Turner,* 1 *Mod.* 212.

On the *twelfth point—*1 *Phill. Evid.* 40. *Goodtitle vs.*

*Welford, Dougl.* 140.    *Goss vs. Tracy,* 1 *P. Wms.* 287, 290.
*Lowe vs. Jolliffe,* 1 *W. Blk. Rep.* 366.    *Anonymous,* 1 *Mod.*
107.    1 *Eq. Ca. Ab.* 225.    2 *Eq. Ca. Ab.* 396, 397.

And, on the *thirteenth point*—*Hulme vs. Tenant,* 1 *Bro.
Chan. Rep.* 16.    *Harg. Co. Litt.* on constructive trusts.

*Moale* and *R. Johnson,* for the Appellees.    1. To show that
no suit at law could be sustained for the recovery of the claim
of the appellees, they cited 1 *Pow. on Cont.* 81 to 87.    *Mar-
shall vs. Rutton,* 8 *T. R.* 545.    *Boggett vs. Frier,* 11 *East,*
301.    *Kay vs. Dutchess de Pienne,* 3 *Campbl.* 12.    *Marsh
vs. Hutchinson,* 2 *Bos. & Pull.* 226.    *Burfield vs. De Pienne,*
5 *Bos. & Pull.* 380.    *M'Namara vs Fisher,* 8 *T. R.* 302.
*Derry vs. Mazarine,* 1 *Ld. Raym.* 147.    *Compton vs. Collin-
son,* 1 *H. Blk.* 348, 349; and *M'Namara vs. Fisher,* 3 *Esp.
Rep.* 18.

2. As to the estate which Mrs. *Price* took under the deed of
trust of 1811, and whether the limitations in that deed were exe-
cuted by the statute of 23 *Hen.* VIII; and to show that it was a
trust, and not a use, and not executed by the statute, they cited
*Harton vs. Harton,* 7 *T. R.* 648    *Shapland vs. Smith,* 1 *Bro.
Chan. Rep.* 75.    *Nevil vs. Saunders,* 1 *Vern.* 415.    *Gregory
vs. Henderson,* 4 *Taunt.* 772.    1 *Madd. Chan.* 360.    *Car-
wardine vs. Carwardine,* 1 *Eden's Rep.* 27, 36, *(note* a.)    2
*Blk. Com.* 365, 335, 336, (and note by *Christian;)* and *West
vs. Biscoe,* 6 *Harr. & Johns.* 465.

3. That the appellees were entitled to the relief prayed in
the bill; and that Mrs. *Price* had a right under the limitations
in the deed to charge the land; and that she had charged it with
the payment of the appellees' claim, they cited *Hulme vs. Te-
nant,* 1 *Bro. Chan. Rep.* 16, 21.    *Grigby vs. Cox,* 1 *Ves.*
517.    *Parkes vs. White,* 11 *Ves.* 208.    *Methodist Episcopal
Church vs. Jaques,* 3 *Johns. Chan. Rep.* 77; and *Skinner vs.
White,* 17 *Johns. Rep.* 358.

*Curia adv. vult.*

Earle, J. at this term delivered the opinion of the court.
We have carefully reviewed the chancellor's decree in this
case, and after deliberately considering the objections to it, we
cannot see any cause to differ in opinion with him.

The two principal objections consist of a question of fact, and a question of law. The first is to the claim or demand exhibited by *Bigham*, the complainant; the last arises upon the marriage settlement appearing in the record. They will be considered in the order in which they are here presented.

The claim set up by the complainant, is a carpenter's account for materials found, and work done, to a large dwelling-house, built by him on the land of the defendant, *Penelope D. Price*, for which he complains he has never been paid. The payment of this debt is not insisted upon, nor even pretended; but it is urged that the building was not finished by the time specified in the contract; that the account is an extravagant one, consisting of many items of expensive work, done to swell and enhance the bill, and that a part of it, performed under a contract with the husband of *P. D. Price*, since deceased, she was made to assume by unfair and improper means.

These objections to the complainant's demand are to be judged of by the testimony in the cause, which has been attentively examined by the court; and after much reflection, we do not think they are sustained. The delay in the completion of the edifice is attributable to the defendant, *P. D. Price*, herself, who suffered the workmen to board at an inconvenient distance from their work, and to be often without employment for want of materials, which were to be hauled in her waggon. The work alleged to be extravagant is suitable to the original plan and outline of the building, and some of it, particularly the inside window shutters, was put up by *P. D. Price's* special directions; and her written assumption to pay for the work about the dwelling-house on her land, in her husband's lifetime, was not obtained by unfair and improper means, being a clause in an agreement entered into by her, under the immediate eye of her husband, and with the express approbation of the defendant, *Alexander Nisbet*, who is the trustee of her estate, and undertook the special business of guarding and protecting her interest.

The question of fact being disposed of, the law objected to the decree, is next to engage our attention. It brings into view a point, which has never before, perhaps, been acted upon by the courts of this state. A married woman, by her con-

tract under seal, charges the payment of a debt on her real estate, which was settled on her by a deed of trust, for her separate use, with a power to sell and convey, and absolutely dispose of the same, by deed or deeds duly executed by her, her coverture notwithstanding; and the question is, how far a court of equity will sanction and enforce the contract, and decree a sale of the land to pay the charge?

Those kind of settlements are in derogation of marital rights, and generally speaking, are not productive of domestic happiness; and perhaps it might be questioned, whether it comports with public policy to favour and encourage them. That they are sometimes commendable, and even useful, cannot, however, be doubted by any. When they are entered into after marriage, they are commonly suggested by some necessity not discovered before the nuptial tie, and are often the means of rescuing families from penury and distress. What led to the settlement under consideration, it is not for us to surmise, but its having been executed subsequent to the union between the husband and wife, is certainly not a circumstance unfavourable to a liberal construction of it.

With these sentiments of the instrument, we proceed to the interpretation which ought, we think, to be given to it. And it appears to us we cannot be mistaken when we observe, that the *jus disponendi* imparted to the wife by this deed of settlement, necessarily includes in it the power to incumber or charge the land conveyed to her as her separate property. She may sell and convey, and absolutely dispose of her estate, by a deed or deeds duly executed by her, and this, agreeably to the terms of the settlement, without the assent of her trustee, or the concurrence of her husband. If then, by a deed or deeds duly executed by her, she can sell and dispose of the whole interest in her land, how can the power to incumber it by mortgage, or charge it by contract, be denied to her? The law allows her, notwithstanding her coverture, to part from her whole estate, upon the principle, that in doing so she acts as a *feme sole* as to her separate property, and upon the like principle, and to promote fair dealing, it must be conceded to her, to incumber and charge it with her debts.

The contract of the 14th of October 1813, between *P. D.*

OF MARYLAND. 319

PRICE & NISBET v. BIGHAM'S EX'TS.—1826.

*Price* and *Bigham*, authorises the trustee *Alexander Nisbet*, to hold the land charged with the payment of the amount of his bill of work, and in case it is not paid by a given time, it authorises him to make sale of so much thereof as will satisfy the payment of it. And can there be a moment's doubt with any one, that if she had been in fact a *feme sole*, equity would have enforced the charge according to the agreement? The greater part of this work was moreover furnished on the faith of this contract, and there seems to be a peculiar equity in making the property, improved by his skill and labour, liable to *Bigham* for the payment of his bill. We decide the case, however, upon the ground of the charge being within the meaning and spirit of the disposing power over her separate estate, secured to the wife by the deed of settlement.

We might perhaps have left the adjudication of this case to rest on the broad grounds, that *P. D. Price* made the contract as a *feme sole*, and that her separate estate is liable for the payment of this debt, without a special charge to make it so; but there is no necessity to insist here upon this doctrine, and therefore we intend to observe silence in relation to it. We choose rather to base our opinion on the position, that *P. D. Price*, having, under the appointing and disposing power of the settlement, specifically charged her separate property with the payment of the debt, it ought to be sold to satisfy it.

DECREE AFFIRMED;

And also *Decreed*, that unless the appellants pay to the appellees the amount ascertained by the said decree to be due by the appellants, with interest, &c. as also the costs incurred by the appellees' testator in the Court of Chancery, and by them in this court, or pay the same into the Court of Chancery on or before, &c. the property mentioned in the proceedings, or so much thereof as may be necessary, be sold according to the said decree of the Court of Chancery, and pursuant thereto, for the purpose of satisfying the sum of money so decreed, with the interest thereon, and the costs aforesaid; and that the Chancellor make all necessary orders for carrying into effect the decree of the Court of Chancery, and of this Court.